**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02658-STV

KRISTIN MARIE BRADLEY,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

      This matter is before the Court on Plaintiff Kristin Bradley's Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq.* [#1]  The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2.  [*See* #13]  The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#10], the parties' briefing [#15, 16], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal.  For the following reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** for further proceedings.

# I. LEGAL STANDARD

## A. Five-Step Process for Determining Disability

The SSA defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[1]  42 U.S.C. § 423(d)(1)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment."  *Lax*, 489 F.3d at 1084.  "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B).

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

---

[1] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 404.1572.

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[2]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education, and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. § 404.1520(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo. 2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

**B.      Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*,

---

[2] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted). The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II. BACKGROUND

Plaintiff was born in 1975. [AR 54, 133][3] Plaintiff has a college degree. [AR 34, 161] She can communicate in English. [AR 35-47, 159] On or about July 22, 2016, Plaintiff filed a Title II application for DIB. [AR 11, 133] Plaintiff claims a disability onset date of November 30, 2015, thus Plaintiff was 40 years old at the time of the alleged onset. [*Id.*] Plaintiff claims disability based upon severe fibromyalgia, severe asthma,

---

[3] All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case. [#10]

chronic migraines, post-traumatic stress disorder ("PTSD"), pleurisy, hypoglycemia, vocal cord deficiency, sub-clinical hypothyroidism, orthostatic hypertension, and type 1 Chiari malformation. [AR 67, 160] Plaintiff worked in a variety of positions prior to the alleged disability onset date, including as a teacher and an assistant director of a child care business. [AR 65, 162] Most recently, Plaintiff worked selling cosmetics, which she did until her alleged onset date. [AR 35-36, 160, 162] Plaintiff has not engaged in substantial gainful activity from her alleged onset date through her date last insured, which the ALJ determined to be December 31, 2016. [AR 13]

### A. Medical Background

Plaintiff's chronic pain began in 2012 or 2013 after she tore her right anterior cruciate ligament ("ACL").[4] [AR 35, 218] She testified that she "worked through it without surgery, but . . . the pain kept getting worse and worse and then started spreading throughout [her] body." [AR 35] Medical records further reflect that Plaintiff suffers from a history of asthma, allergic rhinitis, and vocal cord dysfunction. [AR 217]

In November 2014, Plaintiff went to the emergency room because of an asthma attack. [AR 419, 428] Plaintiff told hospital staff that her problems began the previous day during a martial arts test. [AR 425] Plaintiff indicated that her pain rated at ten on a scale of ten. [AR 424] Medical records indicate that she has a long history of asthma with frequent exacerbation despite medication, often requiring hospitalization. [AR 422] Plaintiff was treated with steroids and responded well. [*Id.*]

At a doctor's appointment in early December 2014, Plaintiff expressed anxiety and vocal cord dysfunction, and the treating physician noted that Plaintiff suffered from

---

[4] Plaintiff testified that she tore her ACL in August 2013 [AR 35], but medical records reflect a September 2012 injury date [AR 218].

vocal cord paresis that "certainly d[id] not improve the situation." [AR 214] At an anemia check-up on or about December 5, 2014, Plaintiff reported that she was "very fatigued" and, based upon a review of laboratory results, mild anemia was indicated. [AR 259] At a cardiology consultation several days later, Plaintiff stated that her chest pain rated from eight to ten out of ten, and could last anywhere from several days to several weeks in duration. [AR 224] The notes from the consultation indicated that Plaintiff was "quite active" but that the chest pain had "sidelined her such that she [wa]s no longer able to work or to compete" in martial arts events. [*Id.*] Plaintiff indicated that she was becoming increasingly fatigued. [AR 225]

On or about December 11, 2014, Plaintiff returned to the emergency room complaining of chest pain. [AR 414, 418] Plaintiff rated her pain as ten out of ten. [AR 256, 408] Medical records reflect an unsteady gait and that Plaintiff needed assistance walking. [AR 411] At a rheumatology consultation several days later, Plaintiff reported to physicians that ibuprofen and steroids helped with her chest pain, but do not eliminate the pain. [AR 274] Plaintiff further indicated that she was starting to notice weakness in her arm, pain and locking in her shoulder, and chronic numbness down the arm. [*Id.*]

By January 2015, Plaintiff began feeling better and described her pain as three out of ten. [AR 271] Ibuprofen improved, but did not eliminate, the pain. [*Id.*] An x-ray revealed some degenerative disk disease. [*Id.*] In February 2015, Plaintiff told medical providers that she was "feeling very well," that her "pain ha[d] subsided," and that she "fe[lt] like she [wa]s back, if not better than she ha[d] been before." [AR 255, 269] She

rated her pain as zero out of ten. [AR 269] She was active and getting ready for competitive martial arts events. [*Id.*]

In early April 2015, however, Plaintiff twice returned to the emergency room with chest pain. [AR 243, 367, 387] The emergency room treatment providers diagnosed her with bronchitis. [AR 243, 376, 391] Plaintiff was given a Z-Pak at her first emergency room visit, but returned to the hospital two days later complaining of increased chest pain. [AR 243] During this second visit, Plaintiff rated the pain as seven on a scale of ten. [AR 379] Plaintiff described herself as "very active, especially with martial arts." [*Id.*] Over the next several weeks, Plaintiff's pain initially lessened [AR 250], but by April 24, 2015, had returned [AR 246, 248]. An examination at the end of April 2015 reflected "marked tenderness" to Plaintiff's left upper chest wall. [AR 246] Further chest pain was noted in medical records from May 2015, along with a note that physicians had been unable to diagnose the cause of Plaintiff's pain. [AR 265]

On June 1, 2015, Plaintiff was again seen at a hospital for evaluation of her chest pain. [AR 287] Records indicate that it was "uncertain if [Plaintiff] ha[d] an underlying inflammatory disorder, but she d[id] have elevated inflammatory markers associated with her episodes." [*Id.*] The records further indicate that her symptoms were improved with Medrol, and Plaintiff "[wa]s back to her normal level of competition." [*Id.*]

In August 2015, Plaintiff went to the emergency room once and was seen by a clinic twice. [AR 290-95, 359] She complained of chest pain which had transitioned from sporadic pain to "more chronic symptoms." [AR 292] At the emergency room, Plaintiff reported that her pain rated ten out of ten. [AR 364] During a clinic visit, she explained that the pain was so severe, at times, that she remained in bed for many days

a week.  [AR 292]  Plaintiff also complained of dizziness and weakness, but denied any numbness or tingling.  [AR 290]  A physical examination revealed chest wall tenderness.  [AR 291]  Nonetheless, she was continuing her martial arts training, which appeared to make the pain worse.  [AR 290, 292]

In September 2015, Plaintiff was treated on several occasions for her pain, including three emergency room visits and a clinic visit.  [AR 297, 324, 335, 344]  By now, the pain had spread to other parts of her body, including her neck, back, feet, and chest.  [AR 296-97]  The pain was so severe that on one occasion she needed to be transported by ambulance to the emergency room.  [AR 297, 324]  On that trip to the emergency room she was nauseous and vomiting.  [AR 328]  The treating physician on September 28, 2015, stated that she suspected a diagnosis of fibromyalgia.  [AR 296]

By October 2015, Patient was feeling better, though she still had intermittent muscle spasms.  [AR 300]  She had stopped exercising, and the doctor recommended building up to physical activity.  [*Id.*]  The treating physician diagnosed her with fibromyalgia.  [*Id.*]

On October 19, 2015, Plaintiff visited South Pointe Clinics for part one of a two-part fibromyalgia evaluation.  [AR 582]  During that consultation, Plaintiff reported that her pain began in 2001 when she was involved in a motor vehicle accident.  [*Id.*]  She described her pain as severe, pervasive, continuous, and life disturbing.  [*Id.*]  She rated her pain as five to six out of ten.  [*Id.*]  She had reduced her martial arts training to once a week and experienced severe fatigue.  [*Id.*]  She said that she had moderate cognitive difficulties due to "fibro fog."  [*Id.*]

On November 23, 2015, Plaintiff returned to South Pointe Clinics for the second part of her evaluation. [AR 580] Medical records noted that Plaintiff had 17 out of 17 fibromyalgia tender points, and had pain with any pressure on the spinous processes. [*Id.*] Two days later, Plaintiff returned to the emergency room with exacerbation of fibromyalgia pain. [AR 318] She reported that she had received a shot earlier in the week and that, since that shot, she had been in persistent pain, lasting three to four days. [AR 318, 320] She rated her pain as ten out of ten. [AR 321]

In early December 2015, Plaintiff reported improved energy and pain levels. [AR 578] She rated her pain as seven out of ten. [*Id.*] She reported moderate cognitive difficulties arising from fibro fog. [*Id.*] She reported walking for exercise and her posture and gait were normal. [*Id.*] Later that month, however, Plaintiff returned to the emergency room due to headaches and fibromyalgia pain. [AR 587] She needed help transporting from the car to the emergency room. [AR 592] She was discharged that day, but returned the next day after she was accidentally hit in the head with a heavy glass candle. [AR 611]

In January 2016, Plaintiff rated her fibromyalgia pain as five or six out of ten. [AR 576] She reported that her symptoms had improved and that she experienced 80% relief with medication. [*Id.*] She noted an increase in pain, however, with the very cold weather. [*Id.*] She said that she was experiencing severe cognitive difficulties due to her fibro fog. [*Id.*] She was not able to exercise, but her posture and gait were both normal. [*Id.*] She also had an emergency room visit for constipation. [*Id.*]

In February 2016, Plaintiff returned to the emergency room with a migraine headache. [AR 663] She reported having daily migraines for approximately two weeks.

[AR 664]  Later that month, she was seen by Boulder Valley Neurology for evaluation of her daily migraines.  [AR 536]  She stated that headaches had been present since 2001.  [*Id.*]  She further reported that the migraines had been steadily getting worse, and had become daily approximately two months earlier.  [*Id.*]  The discomfort was associated with light and sound, as well as nausea.  [*Id.*]  She also reported that she had recently begun having visual "black outs" where she would lose vision completely and pass out.  [AR 574]  She described her fibromyalgia pain as rating seven out of ten.  [*Id.*]  Her gait was normal, though she was using a cane.  [*Id.*]  She continued to have severe fibro fog.  [*Id.*]

At the end of February 2016, Plaintiff returned to the emergency room for chest pain, stating that she was near fainting.  [AR 677]  Her chest was tender to palpation.  [AR 678]  She also had numbness and tingling in her left arm.  [AR 682]

In March 2016, at the recommendation of Boulder Valley Neurology, Plaintiff went through a series of cardiovascular and neurological tests.  [AR 439-511, 513, 537]  An MRI of Plaintiff's brain revealed a Chiari network, but neurology did not believe that this was contributing to any of Plaintiff's symptoms.  [AR 513]  The cardiovascular tests were largely normal.  [*Id.*]  Records from the beginning of the month show that she was exercising four to five times per week.  [AR 571]  At that time, Plaintiff said her pain rated as a seven out of ten and stated that it was eighty percent improved with medication.  [*Id.*]  Her fibro fog was minimal and her energy level was good.  [*Id.*]  Records from the end of that month reflect that she had continued dizziness, but that medications had been somewhat successful in controlling her migraines, and that she

did not have any complaints of chest pain or pressure.  [AR 513]  She was ambulating without difficulty.  [AR 515]

In April 2016, Plaintiff said that her migraines were significantly better.  [AR 531] She stated that the frequency of her headaches had dropped from twice a week in March to once a week.  [*Id.*]  She attributed this improvement to an increase in her medication dosage.  [*Id.*]  She also experienced less fibromyalgia pain and improved energy.  [*Id.*]  She reported that she was back to working at her church.  [*Id.*]

Also in April, Plaintiff underwent a right shoulder MRI due to chronic shoulder pain.  [AR 518]  A review of the MRI found a thickening of the acromioclavicular joint capsule and T2 prolongation in the capsule with multifocal subchondral cysts in the distal clavicle.  [*Id.*]  It also found considerable marrow edema in the distal shaft and subarticular portions of the clavicle, suggestive of chronic clavicular osteolysis.  [*Id.*]

In May 2016, Plaintiff suffered a significant increase in her fibromyalgia pain.  [AR 527]  As a result, she had to go to the emergency room several times.  [*Id.*]  She also reported renewed shoulder pain.  [AR 569]  Her posture and gait were normal.  [*Id.*]  Her energy level was good when not having shoulder pain, and she did not report any cognitive difficulties.  [*Id.*]

By June 2016, Plaintiff reported a significant increase in the frequency of her migraine headaches.  [AR 527]  Boulder Valley Neurology suspected that the increase in migraines was attributable to Plaintiff taking increased medications for her musculoskeletal pain.  [*Id.*]  That same month, Plaintiff had a cortisone shot in her right shoulder.  [AR 521]  At the time, she described her shoulder pain as six out of ten.  [AR 522]  A note from the end of the month indicated that Plaintiff's posture and gait were

normal and that Plaintiff had been having some cognitive difficulties resulting from fibro fog, but that those difficulties were improved. [AR 567]

By July 2016, Plaintiff rated her shoulder pain as two out of ten. [AR 521] But, records from that same period reveal that Plaintiff rated her overall pain as six out of ten. [AR 545] She said that she had a couple of weeks of feeling better and was even able to participate in church activities, but that the pain had returned. [*Id.*] Plaintiff stated that she continued to experience migraines, but did not have a headache or nausea at the time of the appointment. [*Id.*] A report from the end of the month indicated that her posture and gait were normal, but Plaintiff reported some increased fibro fog. [AR 565] Plaintiff reported a pain level of 4 out of 10, and that her pain was relieved 90 percent with medication. [*Id.*]

In early August 2016, Plaintiff returned to Boulder Valley Neurology for a follow-up appointment for her migraines. [AR 525] Plaintiff reported that she was "doing much better." [*Id.*] She said that Ativan had been "very helpful." [*Id.*] Plaintiff said her musculoskeletal pain had been reduced and that her shoulder pain was about 85 percent better after the steroid injection. [*Id.*] She was not having any chest pain. [*Id.*] Her gait was normal. [*Id.*] Medical records from this time period show that Plaintiff's shoulder strength was five out of five and Plaintiff had no tenderness to palpation. [AR 521]

By the end of August 2016, however, Plaintiff's pain had returned. [AR 541] She rated her pain as six out of ten, and said that she experienced pain in all four quadrants of her body. [*Id.*] Plaintiff attributed the return of pain to "over doing it a little" in martial

arts, to which she had recently returned.  [*Id.*]  Plaintiff also stated that she continued to experience migraine headaches.  [*Id.*]

From September through December 2016, Plaintiff consistently rated her pain as between four and seven out of ten, most frequently rating the pain as six or seven out of ten.  [AR 711, 713, 715, 716, 717, 720, 723, 726, 729, 732, 735, 738]  She had pain in all four quadrants of the body, with the most significant pain in her lower back.  [AR 711, 713, 715, 716]  Plaintiff reported some relief with medications, but aggravated by activities involving exercises or house chores.  [AR 720, 723, 726]  She was observed limping or walking with the assistance of a cane.  [AR 713, 732, 735, 738]  Medical records from December indicate that Plaintiff had significant cognitive difficulties due to fibro fog.  [AR 712]

In January 2017, Plaintiff reported that she had not been doing well the previous two months, and that the pain and fatigue were so severe that she did not want to get out of bed.  [AR 707]  She rated her pain as six to eight out of ten, but that it could be relieved ninety percent with medications.  [AR 705, 707, 709, 741]  She continued to experience migraines throughout the month of January.  [AR 705, 709]

In February 2017, Plaintiff rated her pain as six to eight out of ten, which could be relieved eighty percent with medications.  [AR 702, 704, 744, 747]  She experienced pain in all four quadrants of the body, with the most significant pain in her right thigh and knee region.  [AR 702]  She also reported continued migraines and tremors.  [AR 702, 744]  She reported continued fibro fog, but improved energy.  [AR 704]  She was walking for exercise.  [*Id.*]

In March 2017, Plaintiff reported to physicians that she was experiencing pain in all four quadrants of her body, describing the pain as a "widespread body ache." [AR 697] She rated her pain as five or six out of ten. [AR 699] She said the weather made it worse. [AR 697] Plaintiff stated that her myofascial work and trigger point injections were helping to control her pain such that she could avoid medications. [*Id.*] She had severe fatigue and moderate fibro fog. [AR 699] Her gait was guarded by shoulder and back pain. [AR 698] Nonetheless, medical records described Plaintiff as fully functional, able to walk, and able to get up and down from a seated position without assistance. [AR 697] She also reported walking several times a day. [AR 700]

## B. Procedural History

Plaintiff's application for DIB was initially denied on November 21, 2016. [AR 53] On January 25, 2017, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). [AR 71-72] A hearing was conducted before ALJ Terrence Hugar on May 10, 2017, where Plaintiff was represented by counsel. [AR 30-52] Plaintiff testified [AR 35-47], as did vocational expert ("VE") Cindy Burnett [AR 47-51].

On June 21, 2017, the ALJ issued a decision denying Plaintiff benefits. [AR 8-23] Plaintiff timely requested a review of that decision by the Appeals Council [AR 1], which denied her request for review on September 7, 2017 [AR 1-3]. Plaintiff timely filed an appeal with this Court on November 7, 2017. [#1] Because the Appeals Council denied Plaintiff's request for review, the ALJ's decision is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. § 404.981.

### C. The ALJ's Decision

The ALJ denied Plaintiff's applications for DIB after evaluating the evidence pursuant to the five-step sequential evaluation process. [AR 13-23] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from November 30, 2015, her alleged onset date, through December 31, 2016, her last insured date. [AR 13] At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, migraines, and asthma. [*Id.*] At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the appendix of the regulations. [AR 14-15]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform sedentary work with the following limitations: Plaintiff could have occasionally engaged in kneeling, stooping, and crouching, and was unable to crawl; Plaintiff was occasionally able to climb ramps and stairs but was unable to climb ladders, ropes, or scaffolds; Plaintiff was unable to be exposed to hazards such as unprotected heights and moving mechanical parts; Plaintiff was unable to tolerate concentrated exposure to extreme heat or cold, loud noise, or very loud noise; Plaintiff could not have concentrated exposure to fumes, odors, dusts, gases, or poor ventilation; Plaintiff required the use of a cane for all ambulation; Plaintiff was unable to engage in overhead reaching with the right (dominant) upper extremity; and Plaintiff was limited to performing simple, routine, and repetitive tasks. [AR 16] The ALJ provided a narrative setting forth the relevant evidence considered in determining the RFC and assigned weight to each of the medical opinions in the record. [AR 16-21]

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. [AR 21] Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [AR 22] Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations: document preparer, printed circuit board assembler, and addressing clerk. [*Id.*] Accordingly, the ALJ determined that Plaintiff was not under a disability from November 30, 2015 through December 31, 2016 (the date last insured). [AR 23]

## III. ANALYSIS

Plaintiff raises two challenges to the ALJ's decision on appeal. First, Plaintiff contends that the RFC is not supported by substantial evidence because the ALJ failed to develop the record regarding Plaintiff's mental limitations. [#15 at 8-10] Second, Plaintiff maintains that the ALJ's adverse credibility determination is not supported by substantial evidence and resulted in the adoption of an RFC that failed to account for limitations stemming from Plaintiff's fibromyalgia. [*Id.* at 10-14] The Court addresses each of these arguments in turn.

### A. The ALJ's Development of the Record of Plaintiff's Mental Limitations

Plaintiff first argues that the RFC is not supported by substantial evidence because the ALJ failed to develop the record regarding Plaintiff's mental limitations. [#15 at 8-10] "The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir. 1993). Where, as here, the claimant is represented by counsel at the hearing,

"the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).

Plaintiff argues that "the ALJ discussed Plaintiff's 'fibro-fog,' yet never obtained an assessment of her memory problems stemming from this severe impairment." [#15 at 11] Plaintiff's medical records indicate that she reported cognitive difficulties related to fibro fog to her medical providers on numerous occasions. [*See, e.g.*, AR 574, 576, 578, 582, 699, 704, 712] On each of these occasions, however, her medical providers described her as alert and oriented. [AR 574, 576, 578, 583, 699, 704, 712] The ALJ also considered Plaintiff's self-assessment of her cognitive difficulties in a Function Report completed by Plaintiff and Plaintiff's testimony at the hearing regarding her cognitive functioning and activities of daily living. [AR 16-17]

A state agency psychologist reviewed the medical records, noted that Plaintiff's pain caused low energy and confusion and that Plaintiff reported trouble with memory and instructions, but nonetheless concluded that Plaintiff's psychological impairments were non-severe. [AR 60-61] Plaintiff was not seeking psychiatric care during the relevant time-period [AR 60], and there was no indication that additional medical records existed that would have suggested that Plaintiff's mental limitations affected her ability to work. In addition, a consultative examination was conducted by a consultative physician. [AR 584-86] The physician conducted a mini mental status examination on Plaintiff and the results were normal. [AR 585] The consultative physician's report notes that Plaintiff could identify objects and follow commands. [*Id.*]

During the hearing, the ALJ asked Plaintiff's counsel whether the record was complete, and counsel confirmed that it was. [AR 32] "Although the ALJ has the duty to

develop the record, such a duty does not permit a claimant, through counsel, to rest on the record—indeed, to exhort the ALJ that the case is ready for decision—and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008). "In short, [the Court] will not ordinarily reverse or remand for failure to develop the record when a claimant is represented by counsel who affirmatively submits to the ALJ that the record is complete." *Id.* Given the evidence in the record addressing Plaintiff's mental functioning and counsel's assurance that the record was complete, the Court finds that the ALJ fulfilled his obligation to adequately develop the record on Plaintiff's cognitive limitations. *See Cowan v. Astrue*, 552 F.3d 1182, 1187-88 (10th Cir. 2008) (finding that ALJ did not need to further develop the record where sufficient information existed for ALJ to make determination and claimant's counsel did not request additional medical records be obtained, a consultative examination be performed, or any further development of the record); *Matthews v. Colvin*, No. 16-223-BMJ, 2017 WL 238441, at *6 (W.D. Okla. Jan. 19, 2017) (finding record sufficiently developed for ALJ to make determination of mental limitations where medical records reflected that plaintiff was treated for depression and anxiety and state-agency psychologist opined that plaintiff's mental impairments were not severe based on a review of the record).

**B.    The ALJ's Findings Regarding Plaintiff's Credibility and Pain**

Plaintiff next argues that the ALJ's adverse credibility determination was not supported by substantial evidence and resulted in the adoption of an RFC that failed to account for limitations stemming from Plaintiff's fibromyalgia. [#15 at 10-14] As noted above, at step four, the Commissioner must determine whether the claimant's RFC—

the functional capacity the claimant retains despite her impairments—is sufficient to allow the claimant to perform her past relevant work, if any. *See* 20 C.F.R. § 404.1520(a)(4); *Grogan*, 399 F.3d at 1261; *Bailey*, 250 F. Supp. 3d at 784. "The RFC must reflect an assessment of both severe and non-severe impairments and where there are subjective symptoms, such as pain, the ALJ must address whether and how the claimant's pain affects his/her 'capacity to work.'" *Brozovich v. Colvin*, No. 14-cv-03436-MSK, 2016 WL 3900685, at *4 (D. Colo. July 19, 2016) (quoting 20 C.F.R. §§ 404.1529, 416.929). "Subjective allegations of pain alone are not sufficient to establish a disability." *Mirabal v. Colvin*, No. 1:15-cv-00869-LF, 2016 WL 8230702, at *4 (D.N.M. Dec. 30, 2016) (citing *Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004)). Instead, the ALJ must apply a "specified analytical rubric" under Social Security Ruling ("SSR") 16-3p or SSR 96-7p.[5] *Brozovich*, 2016 WL 3900685, at *4; *see also* SSR 16-3p, 2016 WL 1119029, at *3 (S.S.A. Mar. 16, 2016); SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

SSR 16-3p dictates a two-step process for the ALJ to analyze complaints of pain. *Mirabal*, 2016 WL 8230702, at *4 (citing SSR 16-3p, 2016 WL 1119029, at *3; 20 C.F.R. §§ 404.1529(b)-(c); 416.929(b)-(c)). First, the ALJ determines whether the claimant has

---

[5] SSR 16-3p superseded SSR 96-7p by "eliminating the use of the term 'credibility,'" in the SSR language, to "clarify that subjective symptom evaluation" is not a character evaluation. *Parker v. Berryhill*, No. 16-cv-2378-WJM, 2017 WL 3315625, at *4 n.7 (D. Colo. Aug. 3, 2017) (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167 (Mar. 16, 2016)). "ALJ[]s are now instructed to consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and to evaluate whether the statements are consistent with objective medical evidence and other evidence in the record." *Id.*; *see also* SSR 16-3p, 2016 WL 1119029, at *4. Because SSR 16-3p went into effect on March 28, 2016, and the ALJ's decision was issued on June 21, 2017 [AR 23], SSR 16-3p applies here. *See* SSR 16-3p, 2016 WL 1237954 (S.S.A. Mar. 24, 2016) (clarifying that the effective date of SSR 16-3p is March 28, 2016).

a medically determinable impairment ("MDI")—a "pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Id.* (citing SSR 16-3p, 2016 WL 1119029, at *3; *Branum*, 385 F.3d at 1273). Second, the ALJ considers the claimant's "statements about the intensity, persistence, and limiting effects of symptoms," and evaluates whether those statements "are consistent with objective medical evidence and other evidence in the record." *Parker v. Berryhill*, No. 16-cv-2378-WJM, 2017 WL 3315625, at *4 n.7 (D. Colo. Aug. 3, 2017); *see also* SSR 16-3p, 2016 WL 1119029, at *4. As part of that analysis, the ALJ should consider the following factors:

(i)  Daily activities;
(ii)  The location, duration, frequency, and intensity of pain or other symptoms;
(iii)  Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
(v)  Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
(vi)  Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii)  Other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.; *see also* SSR 12-2p, 2012 WL 3104869, at *5 (S.S.A. July 25, 2012) (regulations "provid[ing] guidance" on how to "evaluate fibromyalgia in disability claims").

The ALJ must evaluate the plaintiff's complaints about her symptoms "in relation to the objective medical evidence" and other evidence in the record. 20 C.F.R. § 404.1529(c)(4); *see also Thomas v. Berryhill*, 685 F. App'x 659, 664 (10th Cir. 2017). "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," the ALJ "may find the alleged

intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2016 WL 1119029, at *8. "Although courts generally defer to an ALJ's credibility determinations, 'findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Lloyd v. Colvin*, No. 12-cv-03350-RBJ, 2014 WL 503765, at *9 (D. Colo. Feb. 6, 2014) (quoting *Holbrook v. Colvin*, 521 F. App'x 658, 663 (10th Cir. 2013)).

Here, the ALJ found that Plaintiff's fibromyalgia constituted a medically determinable impairment, recognizing Plaintiff's widespread pain and the limitations that pain posed on her daily life. [AR 16-17] But the ALJ concluded that while Plaintiff's "medically determinable impairments could reasonably be expected to produce some of the [ ] alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." [AR 17] As a result, the ALJ concluded that Plaintiff's "statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." [*Id.*]

Plaintiff argues that her testimony was entirely consistent with symptoms of fibromyalgia and that the ALJ failed to "build an accurate and logical bridge between the evidence and his credibility determination." [#15 at 15] This Court agrees. Another Court in this District summarized fibromyalgia as follows:

> Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary 148730 (27th ed.2000). Fibromyalgia can be the basis for a finding of disability. SSR 12–2P, 2012 WL 3104869, at *1 (July 25, 2012). However, because it is "poorly-understood within much of the medical community" and "diagnosed entirely on the basis of patients' reports and other symptoms," *Brown v.*

*Barnhart,* 182 Fed.Appx. 771, 773 n.1 (10th Cir.2006) (citation omitted), it "presents a conundrum for insurers and courts evaluating disability claims". *Welch v. Unum Life Ins. Co. of Am.,* 382 F.3d 1078, 1087 (10th Cir.2004) (citation omitted) (citation omitted); *see also Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996) ("Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots").

The American College of Rheumatology has set forth the following Criteria for the Classification of Fibromyalgia: a history of pain in all quadrants of the body that persists for at least three months and at least eleven out of eighteen positive tender points on physical examination. SSR 12–2P, 2012 WL 3104869, at *2–3 (July 25, 2012). Diagnosis includes ruling out "other disorders that could cause the symptoms or signs" through imaging and other laboratory tests. *Id.* at *3. While the "disease itself can be diagnosed more or less objectively," the "amount of pain and fatigue that a particular case of it produces cannot be." *Hawkins v. First Union Corporation Long–Term Disability Plan,* 326 F.3d 914, 919 (7th Cir. 2003). Accordingly, the "lack of objective test findings ... is not determinative of the severity of [a claimant's] fibromyalgia." *Gilbert v. Astrue,* 231 Fed. Appx. 778, 784 (10th Cir. 2007); *see also Richardson v. Astrue,* 858 F. Supp. 2d 1162, 1175 (D.Colo. 2012) (finding that the ALJ "erred by discounting all of Plaintiff's symptoms from fibromyalgia based on the lack of objective tests").

*Escareno v. Colvin*, No. 12-CV-03141-PAB, 2014 WL 1689940, at *6 (D. Colo. Apr. 28, 2014). "The Social Security Administration rulings recognize that the longitudinal record of an individual's symptoms is important in fibromyalgia cases because 'the symptoms of [fibromyalgia] can wax and wane so that a person may have "bad days and good days."'" *Smith v. Colvin*, No. 1:15-CV-02033-CBS, 2016 WL 5956160, at *4 (D. Colo. Oct. 14, 2016) (quoting SSR 12–2P, 2012 WL 3104869, at *6). "Indeed, the symptoms 'may even be absent on some days.'" *Id.* (quoting SSR 12-2P, 2012 WL 3104869, at *5).

Here, after concluding that Plaintiff's statements about her symptoms "have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence" [AR 17], the ALJ discussed both Plaintiff's daily activities and the medical evidence. But, the ALJ failed to adequately articulate how Plaintiff's daily activities and the medical evidence contradicted Plaintiff's description of her symptoms, particularly considering the sporadic nature of fibromyalgia symptoms. For example, the ALJ noted that Plaintiff drives infrequently, does not use stairs on bad days, goes to the grocery store but needs a wheelchair or cane to do so, and prepares frozen meals on a weekly basis. [AR 18] The ALJ failed to explain how such sporadic and limited activity cast doubt on Plaintiff's description of her symptoms and limitations. *See Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987) ("[The] sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity."). Similarly, the ALJ failed to articulate how Plaintiff's weekly church attendance was inconsistent with Plaintiff's testimony regarding her symptoms. [AR 18]

The ALJ also failed to adequately explain how the medical records contradicted Plaintiff's description of her pain at the hearing, instead selectively choosing certain medical records while ignoring others. At the hearing, Plaintiff testified that her pain-level ranged from a five or six on a good day, to a nine on a bad day. [AR 39] In his opinion, the ALJ found it "significant" that Plaintiff told treating providers in May 2016 that her fibromyalgia flare ups had occurred "much less frequently since she started seeing a specialist" and that such symptoms were "under control." [AR 20] Notably, Plaintiff made this statement while in the emergency room because of an exacerbation

of her fibromyalgia. [AR 688-89] Moreover, between September and December 2016, Plaintiff repeatedly rated her pain as six or seven out of ten [AR 711, 713, 715, 716, 726, 729, 732, 735, 738], which is entirely consistent with Plaintiff's testimony. Yet, the ALJ did not even address those records in his opinion. Likewise, the ALJ discussed Plaintiff's January 2017 statement that trigger point injections provided Plaintiff "significant pain relief" [AR 20 (citing AR 705)], while ignoring her statement from that same month that she had not been doing well and that the pain and fatigue were so severe that she did not want to get out of bed. [AR 707]

The ALJ's selective use of the evidence in the record can also be found in other areas of the opinion. For example, the ALJ cited to neurology treatment records between June and August 2016 indicating that Plaintiff was "doing much better" with her migraines. [AR 19] Yet, the ALJ did not mention later records indicating that Plaintiff continued to suffer from migraine headaches. [AR 702, 705, 709, 744] Similarly, the ALJ found that Plaintiff's ability to homeschool her 11-year-old daughter was inconsistent with her testimony regarding her cognitive abilities, stating "[w]hile the daughter is apparently very self-motivated, [Plaintiff] controls the curriculum and grades her daughter's papers, despite her allegations regarding fibro-fog, short attention span, inability to remember things, and not having the capacity to manage finances." [AR 19] The ALJ, however, seemingly ignored Plaintiff's testimony that she generally only grades papers one-day per week and that, on a bad day, Plaintiff puts the folder for her daughter to turn in her homework upstairs so that her daughter can "turn things in and not bother [Plaintiff] about school." [AR 42]

Because the ALJ relied upon a selective reading of the record evidence to support his credibility determination, the Court concludes that such determination is not supported by substantial evidence. *See Priest v. Barnhart*, 302 F. Supp. 2d 1205, 1215 (D. Kan. 2004) ("The court finds that the ALJ's credibility findings concerning the plaintiff's testimony and complaints are based on isolated readings of excerpted materials, are seriously contradicted by other significant and compelling medical evidence, and, thus, are not supported by the substantiality of the evidence."). In short, the ALJ failed to provide a sufficient explanation for his finding that Plaintiff's testimony about her symptoms was inconsistent with the objective medical evidence and other evidence in the record. The ALJ failed to explain how Plaintiff's ability to perform certain limited activities was inconsistent with Plaintiff's testimony or with the waxing and waning nature of fibromyalgia symptoms. Moreover, where the ALJ did cite to medical records showing Plaintiff describing her symptoms as improving, he often ignored records from the same time period that show Plaintiff's severe pain had returned. *See Schwarz v. Barnhart*, 70 F. App'x 512, 518 (10th Cir. 2003) ("The ALJ may not pick and choose particular entries in a medical record to support his ruling, he must consider the record as a whole.") Once again, the waxing and waning of fibromyalgia pain is entirely consistent with the condition and Plaintiff's own testimony, and the ALJ cannot simply cite to the "good days" while ignoring the "bad days." For these reasons, the Court must **REVERSE** the ALJ's decision.

## IV. CONCLUSION

For the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from November

30, 2015 through December 31, 2016 and **REMANDS** this matter to the Commissioner

for rehearing and reconsideration consistent with this Order.


DATED:  November 26, 2018                    BY THE COURT:

                                             s/Scott T. Varholak_____
                                             United States Magistrate Judge